UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JAMES KEYES                              CIVIL ACTION NO. 6:16-cv-00200

VERSUS                                   JUDGE TRIMBLE

U.S. COMMISSIONER,                       MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### ADMINISTRATIVE PROCEEDINGS

The claimant, James Keyes, fully exhausted his administrative remedies before

filing this action in federal court.  He filed applications for disability insurance

benefits ("DIB") and for supplemental security income benefits ("SSI"), alleging

disability beginning on November 29, 2012,[1] which were denied.[2]  He then requested

a hearing,[3] which was held on January 14, 2014 before Administrative Law Judge

---

[1]      Rec. Doc. 7-1 at 91, 103, 180, 185.

[2]      Rec. Doc. 7-1 at 115, 116.

[3]      Rec. Doc. 7-1 at 124.

Monica J. Anderson.[4]  The ALJ issued a decision on May 30, 2014,[5] concluding that the claimant was not disabled within the meaning of the Social Security Act from his alleged disability onset date through the date of the decision.  The claimant asked for review of the decision, but the Appeals Council concluded that there was no basis for review.[6]   Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action, seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on October 6, 1972.[7]  At the time of the ALJ's decision, he was forty-one years old.  He has an eleventh grade education[8] and relevant work experience as a parts clerk in the oil and gas industry.[9]  He alleged that he has been

---

[4]     Rec. Doc. 7-1 at 51-90.

[5]     Rec. Doc. 7-1 at 32-43.

[6]     Rec. Doc. 7-1 at 5.

[7]     Rec. Doc. 7-1 at 53, 180, 185.

[8]     Rec. Doc. 7-1 at 53.

[9]     Rec. Doc. 7-1 at 54, 214, 230.

disabled since November 29, 2012[10] due to a back injury, high blood pressure, sleep apnea, and a right shoulder injury.[11]

The record indicates that the claimant's lumbar spine problem started when he fell off a roof in 2010.  This Court was unable to locate the precise date of that accident in the record.  X-rays of the lumbar spine, taken on May 2, 2010, showed proper vertebral alignment with no fracture, mild disc space narrowing at the L5-S1 level, and no suspicious bony lesions.[12]  X-rays of the lumbar spine obtained on May 8, 2010, showed no evidence of a fracture, aligned vertebrae, and disc space narrowing at the L5-S1 level.[13]  On May 17, 2010, an MRI of the lumbar spine was obtained, which showed a broad-based left lateral extraforaminal disc protrusion, contacting the left L4 nerve and a central disc protrusion at the L5-S1 level resulting in mild thecal sac stenosis.[14]  An MRI of the pelvis, obtained the same date, was unremarkable.[15]  A lumbar spine study performed at Lourdes Imaging Center on June

---

[10]    Rec. Doc. 7-1 at 180, 185.

[11]    Rec. Doc. 7-1 at 91, 103, 239.

[12]    Rec. Doc. 7-1 at 420, 426.

[13]    Rec. Doc. 7-1 at 419, 425.

[14]    Rec. Doc. 7-1 at 321.

[15]    Rec. Doc. 7-1 at 322.

11, 2010 showed narrowing of the lumbrosacral disc space and mild hypertrophic spurring at L5-S1.[16]

On July 13, 2010,[17] the claimant saw Dr. Stephen I. Goldware, a neurological surgeon, complaining about lower back and bilateral leg pain, worse on the right.  He provided a history of having slipped and fallen off a roof while working about two months earlier.  He reported that his pain worsened after prolonged sitting or standing, and he described numbness and tingling in his legs.  He was able to toe, heel, and tandem walk without difficulty; he had no muscle weakness; and his deep tendon reflexes were all 2+.  However, his pinprick sensation was diminished in the S1 distribution on the right.  The doctor's impression was a herniated disc at L5-S1 and a questionable herniated disc at L4-5 on the left.  He prescribed Percocet for pain, ordered a myelogram, ordered a post-myelogram CT scan, and referred the patient to Dr. Schutte for a surgical consultation.

A CT scan of the lumbar spine, obtained on July 16, 2010, showed a central disc herniation at L5-S1 and a left extraforaminal disc herniation at L4-5 without

---

[16]      Rec. Doc. 7-1 at 326.

[17]      Rec. Doc. 7-1 at 315-318.

conclusive evidence of nerve root compromise.[18]  A lumbar myelogram of the same date showed a ventral extradural defect at L5-S1.[19]

Dr. Goldware's office adjusted the claimant's medication on July 22, 2010 and again on July 27, 2010.[20]  The claimant returned to Dr. Goldware on August 12, 2010.[21]  He was still having back pain radiating down the back of both legs, his examination was essentially the same as before, and Dr. Goldware recommended bilateral discectomy and fusion at L5-S1 and exploration at the L4-5 level.  The Percocet prescription was refilled.

Dr. Goldware operated on the claimant's lumbar spine on August 30, 2010,[22] performing a partial hemilaminectomy and foraminotomy at L5-S1 on the left with removal of herniated disc, laminotomy of L5-S1 on the right, and transpedicular exploration of L4-5 on the left.  The discs were not removed at L5-S1 on the right or at L4-5.

---

[18]     Rec. Doc. 7-1 at 340.

[19]     Rec. Doc. 7-1 at 323.

[20]     Rec. Doc. 7-1 at 337.

[21]     Rec. Doc. 7-1 at 311-313.

[22]     Rec. Doc. 7-1 at 403-408.

The claimant followed up with Dr. Goldware on September 7, 2010.[23]  He reported moderate to severe incisional pain and tingling pain in his left leg down to the foot.  He complained of burning on urination and urinary frequency, which Dr. Goldware suspected signaled a urinary tract infection.  The claimant's gait was slow and stiff but his strength and reflexes were normal.  The straight leg raise test caused low back pain.  Because the claimant stated that the Percocet prescription was too strong, the dosage was reduced.

The claimant saw Dr. Louis C. Blanda, Jr. of the Lafayette Bone and Joint Clinic on October 11, 2011,[24] complaining about right shoulder and chest pain.  He gave a history of having been injured at work on September 22, 2011, when scaffolding collapsed and struck him.  He complained of constant pain that he rated a seven on a ten-point scale.  He reported that bending and stooping aggravated his symptoms, that he experienced pain in the chest with breathing, and that his condition worsened when he tried to lift his arm and shoulder.  He was taking Tramadol, Aleve, and Ibuprofen and using Flector patches.  He stated that these medications did not relieve his pain.  Dr. Blanda placed him on no-work status.

---

[23]     Rec. Doc. 7-1 at 306-307, 310.

[24]     Rec. Doc. 7-1 at 343, 345-346, 383.  This treatment note is incomplete.

The claimant returned to Dr. Blanda on November 8, 2011.[25]  The progress note indicates that the claimant was injured at work in September and was diagnosed with an AC joint separation.  At this appointment, he was still wearing a sling and complaining of significant pain.  He was able to abduct and forward flex his right arm to 90 degrees but had markedly limited internal rotation.  Testing showed that his right shoulder was weak.  He was referred to physical therapy and remained on no-work status.

On April 19, 2012, the claimant returned to see Dr. Blanda.[26]  The progress note explained that the claimant had been diagnosed with fractured ribs and a separated right AC joint after an injury at work.  At this appointment, he continued to complain of neck pain, right shoulder pain, and right chest wall pain.  He had not attended the ordered physical therapy because of a denial by workers' compensation.  X-rays showed that the rib fractures had healed but continued to show the right AC joint separation.  Examination showed marked tenderness with palpation of the right AC joint, pain with cross body abduction, a reduced ability to abduct and forward flex the right arm, decreased grip strength on the right, and tenderness on palpation of the posterior paraspinous muscles of the neck.  Dr. Blanda prescribed Elavil (an

---

[25]     Rec. Doc. 7-1 at 348.

[26]     Rec. Doc. 7-1 at 347-347.

antidepressant), ordered a cervical MRI, and agreed to submit a form to the workers' compensation carrier.

On June 28, 2012, the claimant saw Dr. Paul Gulotta,[27] complaining of rashes, cough, chills, and an itchy throat.  He claimed to have been exposed to chemicals after an explosion on June 14, 2012, and to have developed intermittent shortness of breath, a lump on his chest, and anxiety since the explosion.  He was diagnosed with uncontrolled hypertension, shortness of breath, and chest pain.

On January 30, 2013, an echocardiogram report showed that the claimant had a mildly enlarged left atrium.[28]

A lumbar MRI of February 7, 2013,[29] showed moderate degenerative disc disease at L4-5 and L5-S1, evidence of a left microdiskectomy at L5-S1, a left paracentral zone enhancing surgical scar with small medial component of recurrent disc protrusions at L5-S1, mild bilateral foraminal stenosis at L5-S1, and mild left foraminal stenosis at L4-5.  A cervical MRI of the same date showed a mild to moderate disc protrusion with resulting mild spinal canal stenosis at C5-6.[30]

---

[27]    Rec. Doc. 7-1 at 350-352.

[28]    Rec. Doc. 7-1 at 416.

[29]    Rec. Doc. 7-1 at 362-363.

[30]    Rec. Doc. 7-1 at 364-365.

On February 16, 2013, the claimant was examined by Dr. Jacques Courseault at the request of Disability Determination Services.[31]  The claimant reported lumbar pain without radiation that he rated at nine out of ten and shoulder pain that is worse with lifting and hanging but better in a sling, which he rated at eight out of ten.  He gave a history of having had high blood pressure for six months.  He stated that he was taking Elavil for anxiety with minimal benefit.  He reported having sleep apnea, which results in excessive fatigue, and stated that he had an upcoming appointment for a sleep study.[32]  He complained of fatigue, headaches, chest pain, shortness of breath on exertion, and coughing up blood.  He also complained of low back pain, weakness, depression, and difficulty sleeping.  Dr. Courseault's physical examination and x-ray of the right shoulder did not detect a palpable AC joint separation but the claimant had mild tenderness over the right AC joint, and his range of motion in that joint was limited.   Dr. Courseault opined that the claimant might have been developing adhesive capsulitis due to having had his arm in a sling for six months and might be limited in his ability to reach overhead.   He further opined that this condition should resolve with proper treatment and therapy.  Faber sign was positive but the straight leg raise test was negative, and the claimant was tender to palpation

---

[31]     Rec. Doc. 7-1 at 356-360.

[32]     The record contains no evidence that sleep study was ever done.

bilaterally at the sacroiliac joint. In Dr. Courseault's opinion, the claimant should be allowed to alternate sitting and standing as needed to relieve SIJ pain. The claimant's grip strength was intact, he was capable of fine motor movements, and his dexterity and ability to grasp objects bilaterally were intact. He had good muscle tone and his strength was 5/5 bilaterally in all muscle groups; however, Dr. Courseault detected abnormal reflexes. His diagnoses were abnormal reflexes, AC joint pain, possible adhesive capsulitis, bilateral sacroiliac joint dysfunction, high blood pressure, anxiety, and sleep apnea. Dr. Courseault found that the claimant was capable of walking and lifting or carrying objects for a full work day with the sit/stand exception and with the exception of reaching above his head with his right arm.

The very next day, on February 17, 2013, the claimant underwent a laparoscopic cholecystectomy with intraoperative cholangiogram due to gallstone pancreatitis and a history of severe abdominal pain.[33]

Four days later, on February 21, 2013,[34] the claimant returned to see Dr. Blanda. Dr. Blanda noted that he had not seen the claimant since April 19, 2012. On examination, Dr. Blanda noted that the claimant had spasms and a positive Spurling's sign on the right. He complained of back and right leg pain with slight numbness and

---

[33]    Rec. Doc. 7-1 at 392-395, 421-422, 427-428.

[34]    Rec. Doc. 7-1 at 367, 378.

weakness.  Dr. Blanda noted that his MRI showed a moderate herniated disk at C5-6 and a recurrent lumbar problem.  Dr. Blanda issued an order for the claimant to have physical therapy of his cervical spine, lumbar spine, and right shoulder and arm.  Dr. Blanda prescribed Percocet for pain.  This treatment note also indicated that the claimant's workers' compensation claim had been settled.

The claimant went to physical therapy on March 4, 2013, March 6, 2013, and March 8, 2013,[35] and on April 18, 2013, he returned to Dr. Blanda.[36]  He reported that his pain was increasing and that he now had pain in his left leg.  He complained of right hand numbness in all fingers.  Tinel's sign was negative at the right wrist but Phalen's sign was positive.  He had a weak right grip and decreased range of motion in his cervical spine.  The diagnosis was a herniated cervical disk at C5-6.  Dr. Blanda ordered an EMG and nerve conduction study of the claimant's right arm.[37]  The claimant declined spine injections.  Dr. Blanda noted that he would seek authorization from the claimant's insurer for surgery – an ACDF at C5-6 with plate and graft.  The claimant's medications were refilled.

---

[35]    Rec. Doc. 7-1 at 371-377.  The record contains no evidence of any other physical therapy appointments.

[36]    Rec. Doc. 7-1 at 385.

[37]    There is no evidence in the record that this recommended testing was ever performed.

On April 23, 2013, Dr. Blanda noted that the claimant was not employable due to restrictions on his activities.[38]  In Dr. Blanda's opinion, the claimant was restricted from lifting and carrying more than ten pounds, and restricted from pushing or pulling more than twenty-five pounds.  He was also to do no repetitive lifting, bending, or twisting.  Further, he was to be permitted to sit or stand at will and to lie down if necessary.  Finally, he was to do no overhead activity.  On the same date, Dr. Blanda prescribed Soma.[39]

The claimant saw Dr. Blanda again on July 18, 2013, reporting right shoulder pain.[40]  The EMG and nerve conduction studies had not been done as ordered.  On examination, there were neck and back spasms.  He was given a Depo Medrol injection.  Dr. Blanda stated that he was going to schedule the neck surgery.  Because the claimant complained of sexual dysfunction, Dr. Blanda prescribed Viagra.

On August 28, 2013, the claimant began receiving mental health treatment at Iberia Behavioral Health.[41]  His chief complaint was that he was depressed because he wife was leaving him.  He was found to have a depressed mood, poor

---

[38]     Rec. Doc. 7-1 at 382.

[39]     Rec. Doc. 7-1 at 386.

[40]     Rec. Doc. 7-1 at 414.

[41]     Rec. Doc. 7-1 at 485-488.

concentration, agitation, homicidal ideation, suicidal ideation, audio hallucinations, poor sleep, paranoia, visual hallucinations late at night, bad dreams, anxiety, panic attacks, hopelessness, helplessness, isolating behavior, and anhedonia. The diagnosis was major depressive disorder, single, severe, with psychotic features.

On September 6, 2013,[42] the claimant saw Dr. Patrice Ambrose at the New Iberia mental health clinic. His mood was anxious and depressed with a blunted, tearful affect. He was prescribed Celexa and Vistaril and advised to follow up with treatment for sleep apnea and hypertension. The claimant returned for further psychotherapy on September 24, 2013[43] and October 4, 2013.[44] On the latter date, he reported that the Celexa and Vistaril were ineffective and that his depression and anxiety symptoms were worsening. He still had audio/visual hallucinations but no suicidal or homicidal ideation. The Celexa and Vistaril were discontinued and Paxil and Seroquel were prescribed.

On October 22, 2013, the claimant was seen in the emergency department at Iberia Medical Center.[45] He was diagnosed with hypertension, nausea, and vomiting.

---

[42]    Rec. Doc. 7-1 at 483-484.

[43]    Rec. Doc. 7-1 at 482.

[44]    Rec. Doc. 7-1 at 480-481.

[45]    Rec. Doc. 7-1 at 417

He was given Zofran, Motrin, and Clonidine and released with instructions to follow up with his primary care physician.

On November 12, 2013, the claimant returned to the New Iberia mental health clinic.[46]  He reported no improvement in his depression or anxiety.  He was sleeping better but reported seeing men in black cars and helicopters following and watching him.  He reportedly was taking Xanax, Soma, and Oxycodone prescribed by Dr. Blanda; however, there is no evidence in the record that Dr. Blanda ever prescribed Xanax or Oxycodone for the claimant.  The dosages of Paxil and Seroquel were increased.

On December 10, 2013, the claimant was seen by a social worker at the New Iberia mental health clinic.[47]  He continued to exhibit a depressed mood, and he continued to report visual hallucinations.

The claimant returned to the emergency department at Iberia Medical Center on December 29, 2013, complaining of abdominal pain and diarrhea.[48]

---

[46]    Rec. Doc. 7-1 at 477-479.

[47]    Rec. Doc. 7-1 at 476.

[48]    Rec. Doc. 7-1 at 410-412.

The claimant again saw a social worker at the New Iberia mental health clinic on January 7, 2014.[49]   He reported better sleep and less agitation but he was continuing to see men in trucks that he believed were trying to find and hurt him.  He reported that he started seeing things after the 2012 explosion.  He also reported memory problems.  He was hopeful that he would soon be able to obtain disability benefits.

On January 8, 2014, the claimant presented at the emergency department of University Hospital and Clinics in Lafayette, Louisiana.[50]  His chief complaints were shortness of breath and high blood pressure.  He indicated that he had been off his hypertension medication for about six months.  He was diagnosed with an upper respiratory infection.

On January 14, 2014, the claimant testified at a hearing regarding his symptoms, his medical treatment, and the effect of his impairments on his functional ability.  It quickly became apparent that the claimant is a very poor historian.  He had a great deal of difficulty with chronology and had to be assisted by his attorney.  He attributed his alleged disability to pain resulting from two accidents – one that resulted in lumbar surgery and the other that resulted in a recommendation for

---

[49]     Rec. Doc. 7-1 at 475.

[50]     Rec. Doc. 7-1 at 462-467.

cervical spine surgery.  He wore a neck brace to the hearing even though no doctor had prescribed it for him.[51]  He testified that he was still treating with Dr. Blanda for his neck and shoulder but had not seem him since July 2013.[52]  He had not had the nerve conduction studies recommended by Dr. Blanda,[53] and there is no evidence in the record that he has yet undergone the cervical surgery recommended by Dr. Blanda.  The claimant stated that he does not do laundry or dishes, sometimes has difficulty getting in the bathtub, experiences back pain when he bends down, and sometimes has weak legs.[54]  He stated that he feeds himself with his left hand because his right hand is weak.[55]  He claimed that he sometimes cannot use his right arm due to pain and spasms.[56]  He claimed that he can only walk slowly and that his back pain occurs when walking, sitting, and lying down.[57]  His primary complaint was back and neck pain.  When asked why he stopped working, however, he stated that his mother

---

[51]     Rec. Doc. 7-1 at 64-66.

[52]     Rec. Doc. 7-1 at 78.

[53]     Rec. Doc. 7-1 at 72.

[54]     Rec. Doc. 7-1 at 71.

[55]     Rec. Doc. 7-1 at 72.

[56]     Rec. Doc. 7-1 at 74-75.

[57]     Rec. Doc. 7-1 at 76.

was ill and he "set out to help her."[58]  When pressed by the ALJ, however, he then

began discussing the back and neck problems precipitated by the two accidents.[59]

On February 4, 2014, the claimant again saw a social worker at the New Iberia

mental health clinic.[60]  He reported that his depression and anxiety levels had not

changed but his hallucinations had decreased and he felt calmer.  However, he also

reported flashbacks regarding people running, sirens, and screaming.

On June 17, 2014, the claimant's chest and right shoulder were x-rayed at

Franklin Foundation Hospital in Franklin, Louisiana.[61]  The chest x-ray showed no

acute cardiopulmonary abnormalities.  The x-ray of the right shoulder showed a grade

III AC separation and a possible non-displaced fracture.  The radiologist noted that

the claimant had a history of trauma, but there was no information concerning

whether this injury resulted from the 2011 incident with the scaffolding or resulted

from some more recent traumatic event.

On June 23, 2014,[62] the claimant was seen in the emergency room at Franklin

Foundation Hospital and diagnosed with an AC separation.  He was advised to use

---

[58]    Rec. Doc. 7-1 at 56.

[59]    Rec. Doc. 7-1 at 56-57.

[60]    Rec. Doc. 7-1 at 474.

[61]    Rec. Doc. 7-1 at 28.

[62]    Rec. Doc. 7-1 at 27-28.

an arm sling, he was prescribed Anaprox, and he was advised to follow up with an orthopedist in a few days.

## ANALYSIS

### A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[63] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[64] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[65]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[66] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence

---

[63]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[64]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[65]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[66]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

or substituting its judgment for that of the Commissioner.[67]   Conflicts in the evidence[68] and credibility assessments[69] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[70]

## B.  ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[71]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and

---

[67]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[68]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[69]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[70]    *Wren v. Sullivan*, 925 F.2d at 126.

[71]    See 42 U.S.C. § 423(a).

-19-

is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[72]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[73] A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[74]

## C.    EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled. This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in

---

[72]    42 U.S.C. § 1382(a)(1) & (2).

[73]    42 U.S.C. § 1382c(a)(3)(A).

[74]    42 U.S.C. § 1382c(a)(3)(B).

or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[75] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[76]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[77] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[78]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[79]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[80]  This burden may be

---

[75]    20 C.F.R. § 404.1520.

[76]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[77]    20 C.F.R. § 404.1520(a)(4).

[78]    20 C.F.R. § 404.1545(a)(1).

[79]    20 C.F.R. § 404.1520(e).

[80]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[81]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[82]

### D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since November 29, 2012, the alleged disability onset date.[83]  This finding is supported by substantial evidence in the record.  In fact, the record shows that the claimant did not return to work after the scaffolding accident of September 22, 2011.[84]

At step two, the ALJ found that the claimant has the following severe impairments:   acromioclavicular joint pain with possible adhesive capsulitis, sacroiliac joint dysfunction, cervical disc herniation, degenerative disc disease, and obesity.[85]  This finding is supported by substantial evidence in the record.  However,

---

[81]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[82]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[83]     Rec. Doc. 7-1 at 34.

[84]     Rec. Doc. 7-1 at 57.

[85]     Rec. Doc. 7-1 at 34.

the claimant contends that the ALJ should also have found that he has a severe mental impairment.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[86]  The claimant does not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform less than a full range of sedentary work.[87]  More specifically, the ALJ found that the claimant can lift or carry ten pounds frequently and twenty pounds occasionally; can stand or walk for four hours and sit for six house in an eight hour workday; can occasionally climb ramps and stairs but ever climb ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch, or crawl; can occasionally reach overhead with his right arm; can alternate sitting and standing to relieve back pain; and can only perform unskilled work.[88]  The claimant contends that because he must alternate sitting and standing, he cannot perform sedentary work.

---

[86]     Rec. Doc. 7-1 at 37.

[87]     Rec. Doc. 7-1 at 38.

[88]     Rec. Doc. 7-1 at 38.

-23-

At step four, the ALJ found that the claimant is not capable of performing his past relevant work as a parts clerk.[89]  The claimant does not dispute this finding.

At step five, the ALJ found that the claimant was not disabled from November 29, 2012 (the alleged disability onset date) through May 30, 2014 (the date of the decision) because there are jobs in the national economy that he can perform.[90]  The claimant challenges this finding.

E.    **THE ALLEGATIONS OF ERROR**

The claimant contends that the Appeals Council erred by failing to include a certain x-ray report in the record and in failing to find that report material to the time period in question.  The claimant also contends that the ALJ erred by (1) finding that the claimant can perform sedentary work even though he is required to alternate sitting and standing due to back pain; (2) failing to properly apply SSR 96-9p; (3) assigning great weight to the consulting examiner's opinions; and (4) failing to find that the claimant has a severe mental impairment.

F.    **DID THE APPEALS COUNCIL ERR?**

The claimant argued that the Appeals Council committed reversible error by failing to remand this matter to the ALJ for consideration of newly-submitted

---

[89]      Rec. Doc. 7-1 at 41.

[90]      Rec. Doc. 7-1 at 42-43.

evidence.  The new evidence is an x-ray, taken on June 17, 2014, which shows that the claimant has a grade III AC separation in his right shoulder.[91]  The Appeals Council stated that, because the ALJ decided the case on May 30, 2014, this evidence does not affect the decision about whether the claimant was disabled before May 30, 2014.[92]

Claimants are free to submit new evidence to the Appeals Council.[93]  Such evidence is considered part of the record upon which the Commissioner's final decision is based.[94]  The district court must examine all of the evidence, including the new evidence, to determine whether the Commissioner's final decision to deny a claim is supported by substantial evidence.[95]  Newly-submitted evidence is material if (1) it relates to the time period for which the disability benefits were denied; and (2) there is a reasonable probability that it would have changed the outcome of the disability determination.[96]

---

[91]    Rec. Doc. 7-1 at 28.

[92]    Rec. Doc. 7-1 at 6.

[93]    20 C.F.R. § 404.968(a).

[94]    *Higginbotham v. Barnhard*, 405 F.3d 332, 337 (5th Cir. 2005).

[95]    *Sun v. Colvin*, 793 F.3d 502, 510 (5th Cir. 2015).

[96]    *Castillo v. Barnhart*, 325 F.3d 550, 551-52 (5th Cir. 2003) (per curiam); 20 C.F.R. § 404.970(a)(5).

The claimant contends that he sustained a shoulder injury in September 2011, and Dr. Blanda diagnosed him with an AC joint separation in the right shoulder in November 2011.[97]   The claimant continued to complain about his right shoulder thereafter.  Although Dr. Courseault did not detect physical evidence of an AC joint separation when he examined the claimant in February 2013, he did conclude that the claimant had a right shoulder condition that limited his functionality and should be treated.  The June 2014 x-ray provides evidence of a specific condition in the shoulder.  However, it is not clear whether what was observed in that x-ray resulted from the alleged accident of September 2011 or from some later event.  Most important, while the x-ray provides the basis for a diagnosis of a particular condition in the claimant's shoulder, it does not shed any light on how that condition affects the claimant's functionality.  The mere existence or diagnosis of a condition does not equate with a finding of disability under the Social Security Act.[98]

Therefore, it is unclear whether the new evidence relates to the time period for which the disability benefits were denied, and there is no reasonable probability that consideration of this new evidence would have changed the outcome of the disability

---

[97]      Rec. Doc. 7-1 at 348.

[98]      *McLendon v. Barnhart*, 184 Fed. App'x 430, 431 (5th Cir. 2006).  See also *Randall v. Astrue*, 570 F.3d 651, 658-59 (5th Cir. 2009); *Kraemer v. Sullivan*, 885 F.2d 206, 208-09 (5th Cir. 1989).

determination.  Therefore, the Appeals Council did not err in declining to grant review of the ALJ's decision based on the newly-submitted evidence.

**G.    DID THE ALJ ERR IN FINDING THAT THE CLAIMANT CAN PERFORM SEDENTARY WORK WITH THE RESTRICTION THAT HE BE PERMITTED TO ALTERNATE SITTING AND STANDING?**

The ALJ determined that the claimant has the residual functional capacity to perform less than the full range of sedentary work.  More specifically, the ALJ included a list of restrictions on the claimant's functionality in her residual functional capacity finding.  Among those restrictions is that the claimant must be allowed to alternate sitting and standing to relieve back pain.  When a person has to alternate between sitting and standing in order to work the entire day, his residual functional capacity does not fit within the definition of sedentary work.[99]  Accordingly, the Commissioner's argument that the ALJ actually assessed the claimant as having a residual functional capacity somewhere between sedentary and light work lacks merit.  Because the ALJ stated that the claimant must be allowed to alternate sitting and standing at will while on the job, the ALJ was correct in describing the claimant as having the ability to perform less than the full range of sedentary work.

The Fifth Circuit has determined that when a claimant is required to alternate sitting and standing throughout the work day, the ALJ must obtain expert vocational

---

[99]    *Scott v. Shalala*, 30 F.3d 33, 34 (5th Cir. 1994).

-27-

testimony concerning whether there actually are job in the national economy that the claimant is capable of performing.[100]  In this case, a vocational expert testified at the hearing and stated that there are jobs with a sedentary rating that would permit the claimant to alternate sitting and standing during the work day.  Therefore, the ALJ did not err in finding that the claimant is not disabled even though he must alternate sitting and standing.  This assignment of error lacks merit.

## H.    DID THE ALJ PROPERLY APPLY SSR 96-9P?

SSR 96-9p addresses "the impact of a residual functional capacity (RFC) assessment for less than a full range of sedentary work on an individual's ability to do other work."  The claimant argued that the ALJ erred in failing to apply this regulation in this case.  The regulation states, however, that an individual having the ability to do less than a full range of sedentary work is not automatically disabled. Instead, this regulation requires an ALJ to consider whether there is other work in the national economy that the individual is able to do.  As noted above, a vocational expert testified at the hearing that there is work that the claimant can perform even though the restriction that he be permitted to alternate sitting and standing during the work day erodes the range of sedentary work that he can perform.  Therefore, the ALJ

---

[100]    *Scott v. Shalala*, 30 F.3d at 33-34.

properly analyzed the claimant's residual functional capacity, and her failure to mention SSR 96-9p in the ruling was not reversible error.

## I.    DID THE ALJ ERR IN ASSIGNING GREAT WEIGHT TO DR. COURSEAULT'S OPINIONS?

The claimant argues that the ALJ erred in assigning great weight to the opinions of Dr. Courseault because Dr. Courseault did not know that the claimant had a cervical disc herniation.  The claimant does not argue that the ALJ erred in failing to give controlling weight or great weight to the claimant's treating physician, Dr. Blanda.  Even if the claimant had made that argument, however, the result would not have been different because the opinions of Dr. Blanda and Dr. Courseault with regard to the claimant's functional limitations are actually very similar.

The major difference between the two doctors' opinions is that Dr. Blanda opined that the claimant is not employable, while Dr. Courseault opined that the claimant is capable of working but with a list of significant restrictions, all of which are mirrored in Dr. Blanda's treatment notes.  The ALJ need not accept Dr. Blanda's opinion that the claimant is not capable of working.  A doctor's opinion that an individual is disabled has no special significance, since the determination of whether a claimant is disabled is reserved to the Commissioner.[101]

---

[101]    *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

The ALJ is required to evaluate every medical opinion and to consider various factors in deciding how much weight to give to all such opinions.[102]   A treating physician's opinions on the nature and severity of a claimant's impairment are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence.[103]

Dr. Blanda opined that the claimant was not employable due to restrictions that Dr. Blanda placed on his activities.  In Dr. Blanda's opinion, the claimant should not lift or carry more than ten pounds; should not push or pull more than twenty-five pounds; should not do any repetitive lifting, bending, or twisting; should not do any overhead activity; and should be allowed to sit or stand at will and to lie down if necessary.[104]   In Dr. Courseault's opinion, the claimant should not do any overhead lifting with his right arm and should be permitted to alternate sitting and standing as necessary.

Neither doctor found that the claimant was limited in his ability to walk, stand, or sit so long as he could alternate sitting and standing at will.  Dr. Blanda added that

---

[102]    20 C.F.R. 404.1527(c).

[103]    *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995);

[104]    Rec. Doc. 7-1 at 382.

the claimant should be permitted to lie down as necessary, but the basis for that additional restriction was not attributed to any particular physical condition and, for that reason, was not supported by clinical evidence. Accordingly, the ALJ did not err in failing to incorporate that restriction in her residual functional capacity finding.

The ALJ gave some weight to Dr. Blanda's opinions, gave great weight to Dr. Courseault's opinions, and incorporated most of their restrictions in her residual functional capacity evaluation, finding that the claimant is capable of sedentary work (which means lifting no more than ten pounds at a time), can occasionally reach overhead with his right arm, and should be permitted to alternate sitting and standing.[105]

This Court finds that the ALJ applied proper legal standards when evaluating the doctors' opinions and deciding how much weight to give them. This Court further finds that substantial evidence in the record supports the ALJ's decision in that regard. Therefore, this assignment of error lacks merit.

**J.**    **DID THE ALJ ERR IN FINDING THE CLAIMANT'S MENTAL IMPAIRMENT IS NOT SEVERE?**

The record is clear that the claimant stopped working in September 2011. His applications for Social Security benefits, which alleged a disability onset date of

---

[105]    Rec. Doc. 7-1 at 38.

November 29, 2012, did not list depression, anxiety, or any other mental impairment as a basis for his alleged disability.  However, a disability report filled out in April 2013 indicated that he treated with Dr. Blanda for anxiety.[106]  That report also indicates that he had anxiety due to an inability to play with his children and depression resulting from marital problems; however, the report also indicates that depression medication helped these conditions.[107]  The record does not indicate that the claimant received any mental health treatment before September 2013, more than two years after he stopped working and almost two years after his alleged disability onset date.  There is no evidence in the record that the plaintiff is unable to work because of his mental health impairments or that his alleged disability is due to any mental health impairments.

When the claimant began receiving mental health treatment, he was diagnosed with major depressive disorder, single, severe, with psychotic features.  He attributed the onset of this condition to his break-up with his wife.  The treatment that the claimant received – prescription medications and counseling sessions with both a social worker and a psychiatrist – resulted in an improvement of his symptoms.  Although his depression and anxiety were not fully resolved, his homicidal and

---

[106]    Rec. Doc. 7-1 at 252.

[107]    Rec. Doc. 7-1 at 256.

-32-

suicidal ideation went away, his hallucinations decreased, his sleep improved, and he was less agitated.  A condition that can be controlled or remedied by medication or therapy cannot serve as a basis for a finding of disability.[108]

More important, the ALJ used the proper technique in evaluating the claimant's mental impairment, and this Court finds that there is substantial evidence in the record supporting the ALJ's conclusion that the claimant's mental health impairment is not severe.

### CONCLUSION AND RECOMMENDATION

**IT IS THE RECOMMENDATION** of this Court that the decision of the Commissioner be **AFFIRMED** and this matter be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within

---

[108]    *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

-33-

fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[109]

Signed in Lafayette, Louisiana, this 19th day of June 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[109]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).